Filed 4/22/14  P. v. Acevedo CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038533 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC952510) |
| v. | |
| BALBINO DUENAS ACEVEDO, | |
| Defendant and Appellant. | |

A jury convicted defendant Balbino Duenas Acevedo of two counts of aggravated sexual assault of a child (Pen. Code, § 269)[1] and five counts of lewd conduct on a child under 14 (§ 288, subd. (a)).  Allegations that he committed lewd acts against more than one victim within the meaning of section 667.61, subdivisions (b) and (e) were also found true.  Defendant was sentenced to 45 years to life in prison.

On appeal, defendant contends that (1) an instructional error undermined his alibi defense; (2) there was insufficient evidence to support the first of his two section 269 convictions; and (3) the sentence imposed pursuant to section 667.61 violated constitutional prohibitions against ex post facto laws.  We affirm.

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise noted.

# I. Background

Silvia Doe's family lived in a rented garage on Lyons Court in San Jose when she was between five and eight years old. The owners of the property lived in the adjacent house. They rented a room in the house to defendant.

The entrance to the garage was in a grassy side yard. There was a door to the owner's backyard at the end of it with "like a storage room" in front of the door. Defendant came through that door and with candy or cookies lured Silvia[2] into the space "behind and in between the door" and the back of the storage room. "[H]e would pull down my underwear or my pants" and "would just start rubbing his fingers" inside the lips of her vagina. This happened "probably two or three times a week" and more than 10 times.

The final incident occurred inside the house. Defendant told Silvia that he had something in his room for her. He lifted her onto a chair, pulled down her underwear, and "started by touching me . . . . And then . . . he pulled out . . . his penis" and started "rubbing it against my vagina." Silvia heard her mother call her name. "[T]hat's when he got all nervous and pulled up my underwear and he told me to go outside and not say anything . . . ." Defendant "rushed" Silvia out of his room.

Silvia's family moved out of the garage when they bought a house in 1996. She did not see defendant again after that. She did not tell anyone about the abuse until 2005. She was 17 when she disclosed it in a personal statement that she was asked to write during her senior year in high school. She gave the statement to the principal to review. He found it "alarming" and spoke to her about it. Silvia told her mother about the abuse that day. The principal reported the abuse to Child Protective Services. Silvia was interviewed by a police officer and later spoke with a sexual assault detective.

---

[2]     We refer to the victims and to some of the witnesses by their first names. We do so not out of disrespect but to avoid confusion and to protect the victims' privacy.

In 2009, a second victim revealed that she was molested as a child by defendant. Elizabeth Doe was born in August 1991. When she was seven and eight, she lived with her parents, her older brother Lewis, and her younger sister Natalie in San Jose. Her family's apartment had three bedrooms. Elizabeth's family occupied one bedroom. Her mother's friend Teresa occupied a second bedroom with her then-husband and their two children. Defendant occupied the third bedroom. Elizabeth's uncles Francisco and F. each lived in the apartment at times during that period. Defendant and F. shared a room at one point.

Elizabeth and her brother Lewis were asleep on a sofa bed in the living room late one night when she was "around 7 or 8." She felt "a presence" and someone touching her. Defendant "was putting his -- well, he put his hand in my vagina . . . ." He was "rubbing it." Elizabeth felt defendant's fingers inside the lips of her vagina. She felt pain. Defendant put "his whole hand" over her face and made the hushing sound "'shhh.'" Elizabeth was "scared" and "[t]errified." "I was little. I didn't know what he was doing to me." She did not say anything or struggle or try to get away. "I just closed back my eyes and let him do what he was doing." She opened her eyes "every second to see if he was gone and he was still there."

Another incident occurred "less than a month" later when defendant lured Elizabeth into his bedroom by "telling me he needed me for something and that he had candy." Defendant told her to lie down on the bed. He was "serious" and said "in [an] aggressive way" that he would hurt her brother if she refused. Elizabeth was crying. Defendant covered her mouth with his hand. She did as she was told and "let him touch me and rub me like the first time." She felt pain in her vagina. She was scared "[a] lot."

Elizabeth did not tell her parents or her brother about the abuse because she was scared by defendant's threats. Defendant regularly threatened her. "He will tell me not to say anything. That if he found out that I said something that he was going to hurt my brother, hurt my parents." He threatened to kill her family. "[H]e said he was gonna go

3

do it with my brother. But I never -- he was going to go hurt my brother but I never knew exactly what he was going to [do] with my brother. And it was just my brother and me and my baby sister, so . . . that's why I told you I just [let him abuse me]."

Elizabeth's family "has a lot of . . . bad past." She was also molested by F., who touched her "over the clothes" when she was "maybe 7, 8, 9 or 10." She eventually made a formal complaint against F. Elizabeth's stepbrother Mauricio was also molested as a child. When she was about 15, she had "a deep talk with [Lewis] about Mauricio being molested." During that talk, Elizabeth told Lewis that defendant had molested her. Lewis encouraged her to tell their father. When she was about 16 and living with her father, she told him that defendant molested her as a child. She was having "really bad nightmares" and "couldn't take it no more, like just seeing him in my dreams and still having that fear." Her father let her decide whether she wanted "to go to the police and tell them about it" or "just to go to therapy but not having to deal with the court issues and like with the police." She chose not to go to the police at that time.

In 2009, Elizabeth "finally" told her mother that defendant molested her as a child. She was 17. She had been caught drinking alcohol the day before and her mother was scolding her. Elizabeth recalled Lewis "yelling" at her, " 'Just tell her. She has to know.' " "[M]y brother . . . was telling me to tell her why was my reason to drink, like why was it that I was always . . . like hurt from inside and outside. I just wanted to drink, and I just wanted to kill myself . . . . And I started drinking. And that's the reason why I started drinking."

Elizabeth's mother reported the abuse to the police. A warrant issued for defendant's arrest. He was apprehended in Laredo, Texas in 2011.

Silvia was 23 when she testified at defendant's trial. She identified him as the man who molested her as a child. Silvia's mother Yolanda testified that she did not know about the abuse until Silvia told her about it in 2005. She described the day when she noticed that Silvia was no longer playing nearby and went outside to look for her. When

4

Yolanda called her name, Silvia came out of defendant's bedroom with a lollipop. "I told her to promise me that she would never take any more candy from that man."

Elizabeth was 20 when she testified at defendant's trial. She identified him as the man who molested her as a child. She explained that she did not report the abuse sooner because she "did not want to deal with all this" or hurt her mother, who blamed herself. "And another reason was that I was still afraid."

Elizabeth rejected any suggestion that she ever confused what defendant did to her with what F. did to her. Defendant was the one who hurt her the most. "[H]e was the one that scared me the most, like the way he looked at me, the way he will talk to me. I was more afraid of him because being little, I didn't know what to do. Like I knew it was bad, but I didn't know how bad it was."

Elizabeth's mother Benedicta also testified for the prosecution. Carl Lewis testified as an expert in child sexual abuse accommodation syndrome (CSAAS).

Defendant's sister Maria Emilia Diaz Acevedo traveled from Garame de Abajo, Mexico to testify for the defense. She and her six children lived there with her mother. Her mother received mail from defendant when he lived in San Jose. Defendant regularly sent the family money from the United States. Diaz Acevedo testified that defendant returned to Mexico to live with her family in "the last days of May or the first days of June" 1998. She remembered the year because he participated in the search effort after her oldest son went missing on November 11, 1998. Her son's body was found on February 2, 1999. Defendant remained in Garame de Abajo until 2000, when he moved to the city of Durango in Mexico. Diaz Acevedo did not know whether defendant ever went back to the United States to visit after he moved in with her family in 1998.

Diaz Acevedo conceded on cross-examination that she did not know "the exact month" when defendant moved to Mexico. She was "certain" that it was before her son went missing in November of 1998.

5

The defense called Elizabeth's brother Lewis to testify. Lewis said he did not have "any idea what it was about" when a police officer came to interview him about the abuse Elizabeth suffered. Lewis knew that defendant and F. both molested Elizabeth. The officer did not volunteer defendant's name or any name during the interview. "He just asked me about [Elizabeth being] sexually assaulted so [the] first person that came to mind was my uncle." "It was just after we started talking" that the officer asked Lewis "if I was to take a look at some pictures, would I be able to recognize the guy." When Lewis saw a picture of defendant in the photo lineup, "[t]hen I knew that it was [defendant] who he was speaking about." Lewis authenticated the audio recording of his police interview.

San Jose Police Officers Carlos Melo, Saul Duran, and Bach Tran described their investigation. Annette Ermshaw testified for the defense as an expert in clinical psychology, forensic psychology, CSAAS, and memory and suggestibility.

After deliberating for less than two hours, the jury returned guilty verdicts on the aggravated sexual assault and lewd conduct counts and found the enhancement allegations true. The trial court found defendant ineligible for probation under section 1203.066, subdivision (a)(7), denied probation, and sentenced him to an aggregate term of 45 years to life. Defendant filed a timely notice of appeal.

## II. Discussion
### A. Claimed Instructional Error

Defendant contends that the trial court erred when it instructed the jury pursuant to CALCRIM No. 207 that "[i]t is alleged that the crime [of aggravated sexual assault] occurred on or about and between August 2nd, 1998 [and] August 3rd, 2000 . . . . The People are not required to prove that the crime took place exactly on those days but only that it happened reasonably close to those days." He argues that the instruction

6

undermined his alibi defense to the aggravated sexual assault charges against him and denied him due process. We disagree.

Generally, a jury should "limit its consideration of the time of the offense to that shown by the evidence . . . ." (*People v. Wrigley* (1968) 69 Cal.2d 149, 157 (*Wrigley*).) Where the defendant has a complete alibi for the specific date the alleged offenses were committed as established by the prosecution's evidence, it is error to lessen the prosecution's burden by instructing the jury that proof on or about the alleged date is sufficient. (*People v. Jones* (1973) 9 Cal.3d 546, 557 (*Jones*), overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Thus, "where the prosecution evidence points to a particular day or hour to the exclusion of any other time, an instruction limiting the jury to a consideration of the time of the offense in accordance with the testimony is proper. Requiring the jury to limit its consideration of the time of the offense to that shown by the evidence precludes them from speculating that it may have occurred at a time other than that shown by the evidence . . . ." (*Wrigley*, at pp. 156-157.) Accordingly, the bench notes to CALCRIM No. 207 state that the instruction "should not be given . . . when the evidence demonstrates that the offense was committed at a specific time and place and the defendant has presented a defense of alibi or lack of opportunity." (Bench Notes to CALCRIM No. 207 (2013) p. 37.)

A different rule applies when the evidence does not point to a specific time and the defendant's alibi is only partial. (*Wrigley*, *supra*, 69 Cal.2d at pp. 156-160.) In those cases, the jury is properly instructed to determine whether the offense was committed on or about the time alleged. (*Ibid.*) In such cases, the "on or about" instruction does not "deflect the jury's attention from a crucial temporal element for which the defendant had an alibi." (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

Here, the prosecution's evidence did not point to a specific date for either time defendant molested Elizabeth. She testified that the charged incidents occurred "a few weeks apart" when she was "around" seven years old. She told the jury that she did not

7

know the specific dates but remembered generally what grade she was in and tried to calculate her age from that. "I remember I was with my -- with my first grade teacher and then my second grade teacher when all this was happening. And I know the age I was around 7 or 8 because that's the age you're supposed to be in first and second grade." The prosecutor told the jury during closing argument that Elizabeth could not "define with very much specificity exactly when this happened." "And so when you see the charging document, of course, we have alleged 7 and 8 years old because that's as close as she can say." "So if you believe that Elizabeth was touched when she was 7 or even close in time to the dates that are alleged to her turning 7, that is absolutely sufficient to support the conviction in this case. . . . Elizabeth is not clear on when this happened, but we know it was very close to her seventh birthday." The prosecutor encouraged the jury "to look back on her testimony."

Defendant relied on his sister's testimony to establish his alibi. But her testimony was vague as to the date he returned to live in Mexico. She testified on direct that he came to live with her family in "the last days of May or the first days of June" in 1998. But she conceded on cross-examination that she did not know "the exact month." She could only say that he arrived before her son went missing in November of 1998. She also equivocated when she was asked if defendant ever returned to San Jose for a visit. "I do not know. I do not know. I don't think so." Elizabeth's mother testified that defendant did return after he retired and moved to Mexico. Benedicta could not recall at first when he left or when he returned but on cross-examination, she suddenly recalled that he returned on July 4, 1998. Elizabeth turned seven in early August 1998. Given that the evidence showed the molestations happened "a few weeks apart" when Elizabeth was "around" seven years old, we conclude that defendant's alibi was only a partial one. Because the prosecution's evidence did not point to a specific date when either molestation occurred and because defendant's alibi was only partial, the trial court did

8

not err in instructing the jury with CALCRIM No. 207. (*Wrigley*, *supra*, 69 Cal.2d at pp. 156-160.)

Defendant's reliance on *People v. Barney* (1983) 143 Cal.App.3d 490 (*Barney*) is misplaced. The defendant in *Barney* was charged with molesting his granddaughter "'on or about' February 8, 1981." (*Id.* at p. 497.) The prosecution's evidence fixed the date of the offense as either Saturday, February 7 or Sunday, February 8 "to the exclusion of any other time." (*Id.* at p. 498.) The defendant challenged an "'on or about'" instruction on appeal. The court held that the instruction was given in error. "There was also testimony numerous other [uncharged] molestations occurred between the Christmastime offense and the terminal offense in issue. These circumstances present a substantial possibility the jury was misled concerning the necessity to agree defendant molested the child during the weekend of February 7 and 8. [¶] . . . [T]estimony concerning uncharged acts of molestation was admissible only in aid of proof of the charged offenses. The instruction that the prosecution need not specifically prove the time of the charged offense, coupled with the prosecution argument it need prove only a last act, not the time of the last act, was error." (*Ibid.*)

This case is different. Unlike in *Barney*, the prosecution's evidence did not point to a particular day or hour to the exclusion of any other time. Elizabeth testified that the two acts occurred "a few weeks apart" when she was "around 7" and in the first or second grade. The prosecutor argued that "Elizabeth is not clear on when this happened, but we know it was very close to her seventh birthday." In this case, it was not error to instruct the jury with CALCRIM No. 207. It follows that there was no violation of defendant's due process rights. (*People v. Osband* (1996) 13 Cal.4th 622, 675 ["Because there was no state law error, neither was there any predicate for a constitutional violation."].)

9

## B. Sufficiency of the Evidence

Defendant contends that there was insufficient evidence to support the first of his two aggravated sexual assault convictions because there was no evidence that he accomplished the first charged act of sexual penetration with a foreign object by force, fear, or menace.  We disagree.

When a defendant challenges the sufficiency of the evidence to support a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] . . . [W]e ' "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

The two section 269 counts charged here were predicated on defendant's violation of section 289, subdivision (a)(1).  The version of section 289 in effect when he committed his crimes provided that "[e]very person who causes the penetration, however slight, of the genital or anal openings of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object . . . when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years." (Former § 289, subd. (a)(1).)  Because these terms are listed in the disjunctive, a "conviction may be

10

upheld if there is substantial evidence [that] the act was accomplished against the victim's will *either* by force, violence, duress, menace, *or* fear of bodily harm." (*People v. Hale* (2012) 204 Cal.App.4th 961, 976.)

"[T]he definition of the word 'force' in sexual offense statutes depends on the offense involved. To convict for committing a forcible lewd act against a child in violation of section 288, subdivision (b), the prosecution must prove that the defendant used physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself. [Citation.] In contrast, the requisite amount of force for a rape conviction is the amount sufficient to overcome the victim's will. [Citation.] This level of force also applies for convictions of aggravated sexual assault of a child by rape and by forcible oral copulation . . . . [Citation.]" (*In re Asencio* (2008) 166 Cal.App.4th 1195, 1200, fn. omitted.) Similarly, the amount of force "required to establish a violation of section 269, subdivision (a)(5): aggravated sexual assault of a child through sexual penetration as defined by section 289, subdivision (a) . . . is that force which is sufficient to overcome the victim's will." (*Asencio*, at p. 1200.) The jury was instructed with CALCRIM No. 1045 that "[a]n act is accomplished by force if a person uses enough physical force to overcome the other person's will."

We find sufficient evidence of force here. Elizabeth was around seven when the first incident happened. She was asleep, seemingly safe in her bed. She awoke in the middle of the night to find defendant molesting her. He was in his 60's. These circumstances compel the conclusion that the only way Elizabeth could have escaped the situation she found herself in was by crying out. But she could not cry out because defendant "put his whole hand" over her face and told her "'shhh.'" "[H]e put his whole hand in my face." Elizabeth felt pain in her vagina. Given her and defendant's relative sizes and ages and the fact that defendant was hurting her, the jury could reasonably have concluded that his act of putting his whole hand over her face and ordering her to hush

11

was a sufficient use of force to overcome her will.  Thus, sufficient evidence of force supported the first of defendant's two section 269 convictions.[3]

### C.  Sentencing Issues

### 1.  Ex Post Facto

Defendant contends that the sentence imposed pursuant to section 667.61 for his section 288, subdivision (a) convictions violated ex post facto principles.  He maintains that the trial court imposed sentence under the current version of the "One Strike Law" and by doing so increased his punishment beyond what he would have faced under the law in effect when he committed his crimes in 1995 through 1998.  We conclude that defendant has not established and cannot establish an ex post facto violation.

Both the federal and state Constitutions prohibit ex post facto laws.  (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.)  The prohibition is based on the principle that "persons have a right to fair warning of that conduct which will give rise to criminal penalties . . . ."  (See *Marks v. United States* (1977) 430 U.S. 188, 191.)  Thus, laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts" are unconstitutional.  (*Collins v. Youngblood* (1990) 497 U.S. 37, 43; *People v. Alford* (2007) 42 Cal.4th 749 (*Alford*).)  California's ex post facto law is analyzed in the same manner as the federal prohibition.  (*Alford*, at p. 755.)

The current version of section 667.61 mandates a prison term of 15 years to life for "any person" convicted of a lewd act in violation of section 288, subdivision (a) if "[t]he defendant has been convicted in the present case . . . of committing  [a qualifying] offense against more than one victim."  (§ 667.61, subds. (b), (c)(8), (e)(4).)  Qualifying offenses include "[s]exual penetration, in violation of subdivision (a) of Section 289" and

---

[3]     Our conclusion makes it unnecessary for us to address defendant's additional argument that there was insufficient evidence of fear to support the first of his two section 269 convictions.

"[l]ewd or lascivious act, in violation of subdivision (a) of Section 288." (§ 667.61, subds. (c)(5), (8).)

The statute in effect when defendant molested Silvia was different. Before 2006, the One Strike law's sentencing mandate applied to persons convicted of a lewd act in violation of section 288, subdivision (a) "*unless* the defendant qualifie[d] for probation under subdivision (c) of Section 1203.066." (Former § 667.61, subd. (c)(7), italics added.)

Former section 1203.066, subdivision (a) made a person "convicted of committing a violation of Section 288 or 288.5 against more than one victim" presumptively ineligible for probation. (Former § 1203.066, subd. (a)(7); (*People v. Wills* (2008) 160 Cal.App.4th 728, 736 (*Wills*).) The defendant could overcome that presumption if the trial court made "all" of the findings specified in former section 1203.066, subdivision (c). One required finding was that the defendant was "the victim's natural parent, adoptive parent, stepparent, relative, or . . . a member of the victim's household who . . . lived in the victim's household" when the molestations were committed. (Former § 1023.066, subd. (c)(1); *People v. Jeffers* (1987) 43 Cal.3d 984, 998-1000 (*Jeffers*).) Another required finding was that "[a] grant of probation to the defendant is in the best interest of the child." (Former 1203.066, subd. (c)(2).) Even if the court made findings favoring the defense, it "'retain[ed] the discretion' to find the defendant unsuitable for probation and to order imprisonment." (*People v. Wutzke* (2002) 28 Cal.4th 923, 932, fn. 7 (*Wutzke*); former § 1203.066, subd. (c)(5).) The trial court was required to "state its reasons on the record for whatever sentence it imposes on the defendant." (Former § 1203.066, subd. (c)(5).)

Here, the information alleged with respect to the section 288, subdivision (a) counts that defendant was "convicted in the present case . . . of committing an offense specified in subdivision (c) against more than one victim . . . ." The jury found those allegations true. The probation report stated that defendant was "ineligible for a grant of

13

probation pursuant to Section 1203.066(a)(7) of the Penal Code." At sentencing, the trial court stated, "In this particular matter, it was referred to the probation department. The court will adopt the recommendation of the probation department. In this particular case probation in this matter is ordered denied. It is denied because the defendant is ineligible pursuant to [section 1203.066, subd. (a)(7)] of the Penal Code."

Defendant argues that the trial court "most likely" applied the current version of the statute and in doing so "increas[ed] his punishment beyond what would have been imposed under the law as it stood from 1995 through 1998." He argues that his sentence violates the constitutional prohibition against ex post facto laws. We cannot agree.

Whether the trial court sentenced defendant under the current or the former version of section 667.61 is not apparent from the record before us. What is apparent is that the trial court could not have granted probation on this record under the former version of section 1203.066. The jury's finding that defendant was "convicted of committing a violation of Section 288 or 288.5 against more than one victim" left him presumptively ineligible for probation. (Former § 1203.066, subd. (a)(7).) He could overcome that presumptive ineligibility only by convincing the trial court that he met "*all*" of the criteria in section 1203.066, subdivision (c). (*People v. Groomes* (1993) 14 Cal.App.4th 84, 89 (*Groomes*) ["a defendant has the burden to present evidence showing that he is entitled to consideration for probation under subdivision (c) of section 1203.066."].) He did not and cannot do so.

The record here established only one of the required findings. Defendant was living with Elizabeth's family at the time of the molestations. Thus, he was "a member of the victim's household who has lived in the victim's household" within the meaning of former section 1203.066, subd. (c)(1). (*Jeffers*, *supra*, 43 Cal.3d at pp. 998-1000.) There is no evidence in the record concerning the other required findings. Even if there were, the trial court could not have made "all" of the required findings because it could not

have found that "[a] grant of probation to the defendant is in the best interest of the child." (Former § 1203.066, subd. (c)(2).)

In *Wills*, the court held that the plain language of subdivision (c) evinced the Legislature's intent that a sentencing court "shall have no authority, and thus no legal discretion" to grant probation to a presumptively ineligible defendant "in a case in which the molestation victim is no longer a child at the time of sentencing." (*Wills*, *supra*, 160 Cal.App.4th at p. 740.) The court explained that "[t]he use of the present tense verb 'is' in [subdivision (c)] indicates a plain and clear legislative intent that the sentencing court must evaluate the circumstances existing at the time of sentencing in determining whether a grant of probation would be in the 'best interest' of the 'child' victim. Had the Legislature intended that such a determination be based on circumstances that existed at the time the defendant molested the victim, it easily could have so provided." (*Wills*, at p. 737.) "Logically, where, as here, the victim is no longer a child at the time of sentencing, the sentencing court is unable to make a finding . . . that '[a] grant of probation . . . is in the best interest of the child' for the simple reason that there is no child. In such a case, the sentencing court is unable to make 'all' of the findings specified in former subdivision (c) of section 1203.066, as required by that subdivision, and thus is not authorized to grant probation" to a defendant found presumptively ineligible for probation under subdivision (a) of that section. (*Wills*, at pp. 737-738.)

We agree with the *Wills* court's analysis. Silvia was 23 when she testified at defendant's trial in this case. Elizabeth was 20. Because neither was a child when defendant was sentenced, the trial court had no authority and therefore no legal discretion to grant him probation under the law in effect when he committed his crimes against Silvia. (*Wills*, *supra*, 160 Cal.App.4th at p. 737.)

It follows that defendant's sentence did not violate ex post facto principles. When defendant committed his crimes, he was subject to the One Strike Law "*unless* [he] qualifie[d] for probation under subdivision (c) of Section 1203.066." (Former § 667.61,

15

subd. (c)(7), italics added.)  The record affirmatively establishes that he could not meet the requirements for probation.  The One Strike Law in effect at the time of his crimes mandated a term of 15 years to life for each of his crimes against Silvia.  (Former § 667.61, subds. (b), (e)(5).)  Thus, his sentence did not subject him to greater punishment than the law at the time of his crimes allowed.  Our conclusion is the same even if we assume that the trial court improperly sentenced defendant under the current rather than the applicable version of the One Strike Law.  As applicable here, both versions mandated the same sentence.  Thus, to the extent sentencing error occurred, it was harmless under any standard of review.

Defendant argues that because the jury never found him ineligible for probation and the trial court never found him not qualified for probation, he "necessarily" fell within the category of those who qualified for probation.  We disagree.

Defendant's argument is based on the faulty premise that former section 1203.066, subdivision (d) required the People to plead and the jury to find him ineligible for probation.  He cites no authority to support that assumption.  There is none.

Former section 1203.066, subdivision (d) provided that "[t]he existence of any fact which would make a person ineligible for probation under subdivision (a) shall be alleged in the accusatory pleading, and either admitted by the defendant in open court, or found to be true by the jury . . . ."  (Former § 1203.066, subd. (d).)  The current version of subdivision (d) is the same.  We must determine what subdivision (d) means.

"The interpretation of a statute presents a question of law subject to de novo appellate review."  (*Wills*, *supra*, 160 Cal.App.4th at p. 736.)  " 'Under settled canons of statutory construction, . . . we ascertain the Legislature's intent . . . to effectuate the law's purpose.  [Citation.]' "  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1125-1126.) " 'Because the language of a statute is generally the most reliable indicator of the Legislature's intent, we look first to the words of the statute, giving them their ordinary meaning and construing them in context.  If the language is unambiguous, we presume

16

the Legislature meant what it said, and the plain meaning of the statute controls. [Citations.]'" (*People v. Anderson* (2010) 50 Cal.4th 19, 29.)

We read subdivision (d) to mean precisely what it says. It requires the People to plead and the jury to find "[t]he existence of any fact" which would make a person ineligible for probation. (Former § 1203.066, subd. (d).) It does not say that the People must plead and the jury must find the ultimate fact of probation ineligibility. The phrase "which would make a person ineligible for probation under subdivision (a)" is a subordinate clause. It describes the category of facts that must be alleged and found true. The facts that must be alleged and found true are facts that establish the existence of a qualifying circumstance (such as the multiple victims circumstance) that would make the defendant presumptively ineligible for probation under section 1203.066, subdivision (a). (See *People v. Superior Court (Frietag)* (1988) 204 Cal.App.3d 247, 248-251 [fact that rendered defendant convicted of nonforcible lewd acts ineligible for probation was sufficiently alleged where the information charged that he had caused great bodily injury to his child victim].) The requisite fact here was the fact that defendant was convicted of committing a violation of section 288 "against more than one victim." (Former § 1203.066, subd. (a)(7).) That fact was alleged in the information. The jury found it true. There was no failure to comply with section 1203.066, subdivision (d).

Defendant argues that the trial court's failure to expressly find him not qualified for probation under section 1203.066, subdivision (c) "necessarily" put him within the category of those who were qualified for probation and thus not subject to the One Strike Law's sentencing mandates. We cannot agree.

In the absence of an affirmative showing of sentencing error, "'the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978; Evid. Code, § 664.) Here, the record affirmatively shows that defendant did not meet "all" of the former section

17

1203.066, subdivision (c) requirements. He was therefore ineligible for probation under former section 1203.066, subdivision (a)(7). We find nothing in the record to establish that the trial court improperly applied the current rather than the former versions of sections 667.61 and 1203.066 at sentencing. The court explained that "probation is denied . . . because the defendant is ineligible pursuant to [section 1203.066, subdivision (a)(7)] of the Penal Code." This was a correct statement of the law under either the former or the current versions of sections 667.61 and 1203.066. Because the record gives us no basis to conclude that the court applied the wrong versions of the statutes, we presume that its statement that defendant was "ineligible pursuant to [section 1203.066, subdivision (a)(7)]" included an implicit determination that defendant did not satisfy the section 1203.066, subdivision (c) criteria. Defendant was properly found subject to the One Strike Law.

## 2. *Apprendi*

Defendant suggests that *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) required the jury to determine whether he was qualified for probation. We disagree.

In *Apprendi,* the United States Supreme Court held that a fact other than a prior conviction that increases the maximum penalty for an offense must be found true by a jury beyond a reasonable doubt. (*Apprendi*, *supra*, 530 U.S. at p. 475.) *Apprendi* does not apply to the factual findings specified in section 1203.066, subdivision (c). Those findings determine whether a defendant is eligible for probation. A denial of probation does not increase the maximum penalty for a violation of section 288, subdivision (a). Nor does a grant of probation decrease the maximum penalty for the offense. A grant of probation simply suspends imposition or execution of the sentence. (§ 1203, subd. (a) [probation is "the suspension of the imposition or execution of a sentence and the order of conditional and revocable release in the community under the supervision of a probation officer."].) The denial of probation in this case is not what increased the maximum penalty for defendant's violations of section 288, subdivision (a). What

18

increased the maximum penalty was the fact that he committed lewd acts against multiple victims.  (§ 1203.066, subd. (a)(7).)  That fact was found true beyond a reasonable doubt by the jury.  There was no *Apprendi* violation.

### 3.  Due Process

Defendant contends that the People's failure to plead that he was not eligible for probation under former section 1203.066, subdivision (a)(7) or that the court would not find him qualified under former section 1203.066, subdivision (c)(1)-(5) failed to apprise him "that the People were seeking jury findings which would expose him to additional punishment . . . under the One Strike Law."  The Attorney General counters that defendant forfeited this issue.  We agree with the Attorney General.  Defendant did not mention this issue below.  We deem it forfeited.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1226-1228.)

### III.  Disposition

The judgment is affirmed.


_____
Mihara, J.


WE CONCUR:


_____
Elia, Acting P. J.


_____
Grover, J.


19